**R. S. MIKESELL ASSOCIATES, a co-partnership, Plaintiff-Appellant,**

v.

**GRAND RIVER DAM AUTHORITY, Defendant-Appellee.**

No. 79–1122.

United States Court of Appeals, Tenth Circuit.

May 7, 1980.

Decided July 15, 1980.

Floyd L. Walker of Walker, Jackman & Adamson, Inc.; Tulsa, Okl., for plaintiff-appellant.

Deryl Lee Gotcher of Jones, Givens, Brett, Gotcher, Doyle & Bogan, Inc., Tulsa, Okl. (Roy C. Breedlove of Jones, Givens, Brett, Gotcher, Doyle & Bogan, Inc., Tulsa, Okl., and Robert W. Sullivan, Jr., General Counsel, Grand River Dam Authority, Vinita, Okl., with him on brief), for defendant-appellee.

Before SETH, Chief Judge, and McKAY and LOGAN, Circuit Judges.

SETH, Chief Judge.

This appeal arises from two written employment contracts providing for financial advice from appellant to appellee Grand River Dam Authority (GRDA) for certain of its bond issues. GRDA is a governmental agency created by the laws of Oklahoma. The first contract was signed in 1966, the second in 1970, and both were terminated by GRDA in 1976. After trial without a jury the court ruled that both contracts were terminable at will and otherwise invalid. The court also ruled the 1970 contract was contingent upon events that had failed to occur. Accordingly, the court entered a judgment in favor of GRDA on both contracts. For the reasons that follow we must reverse as to the 1966 contract but affirm as to the 1970 contract.

The 1966 contract arose from the following circumstances. The Oklahoma legislature had authorized the GRDA to issue bonds up to $110,000,000. By 1966 GRDA had issued bonds in the amount of $72,000,000 largely with the professional advice and assistance of Mr. Mikesell under separate agreements not here relevant. At the time of the 1966 contract there remained to be issued bonds in the amount of $38,000,000. The purpose of the contract by its terms was to employ appellant to "[a]ssist in connection with the marketing from time to time new bonds until the remaining unissued bonds authorized to be issued are issued and marketed." Apparently this was desirable to GRDA because appellant was "thoroughly familiar with the Authority's procedures and requirements for issuing additional . . . bonds." The contract obligated appellant to undertake the employment and to perform duties listed in Section One of the contract. Detailed provisions governing the compensation to be paid appellant were included.

The trial court held that the 1966 contract was terminable at will. This holding of the trial court was based on its finding that the contract had no specified duration or term. The court referred to *Western Star Mill Co. v. Burns*, 305 P.2d 564 (Okl.) (an exclusive sales contract), and *Foster v. Atlas Life Ins. Co.*, 154 Okl. 30, 6 P.2d 805 (an insurance agent's contract). However, in these two cases there was nothing whatever to fix or indicate the term of the agreement nor the intent of the parties as to termination. They were both for a purely indefinite term with no method to ascertain the duration. The case before us is quite different. In *Miller v. Miller*, 134 F.2d 583 (10th Cir.), we applied Oklahoma law and held:

"If no period of duration is specified in a contract, and none can be inferred from its nature and subject matter, the law infers that the parties intended such agreement to be terminable at the pleasure of either party upon reasonable notice. If, however, a period of duration can be fairly implied from the nature of the contract, its subject matter, and the relationship of the parties, the contract is not terminable at the pleasure of either party and the court will give effect to the manifest intent of the parties."

The contract in *Miller* specified no period of time. Nevertheless, it was clear from the nature of the agreement, its subject matter, and the relationship of the parties that performance was to continue for a definite period. *See also Phillips Petroleum Company v. Buster*, 241 F.2d 178 (10th Cir.).

The 1966 contract in the case before us is certain as to purpose and compensation. It is equally certain as to duration, that is the time necessary to issue the remaining $38,000,000 in bonds. This appears

to be the manifest intent of the parties, and the trial court so found. The contract was not intended to last indefinitely, but only until such time as reasonably necessary to issue the remaining bonds. When GRDA terminated the contract in 1976 there remained to be issued $8,800,000 in bonds. The parties thus had been progressing steadily toward complete performance which would soon have meant the end of the contract's duration. We conclude that the term is provided by the nature, subject matter, and purpose of the contract, and the relationship of the parties.

The 1966 contract was thus not terminable at will. In 1A A. Corbin, Contracts § 152, at 14, the author states:

"Secondly, if the employer made a promise, either express or implied, not only to pay for the service but also that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him 'at will' after the employee has begun or rendered some of the requested service or has given any other consideration (or has acted in reliance on the promise in such manner as to make applicable the rule in Restatement, Contracts, § 90)."

■ The trial court ruled that the 1966 contract lacked mutuality of obligation. Under the law of Oklahoma the requirement of mutuality is basically a requirement that a contract be supported by consideration. *Consolidated Pipe Line Co. v. British American Oil Co.*, 163 Okl. 171, 21 P.2d 762. *See also Livingston v. Blair*, 104 Okl. 238, 231 P. 82. An Oklahoma court recently stated: "The requirement of mutuality of obligation is best understood as the requirement of a *quid pro quo* for the creation of legally enforceable obligations." *Langdon v. Saga Corp.*, 569 P.2d 524, 527 (Okl.Ct.App.). But again the Oklahoma state court looks for consideration to meet the mutuality requirement. *See generally* 1A A. Corbin, Contracts § 152. As we noted above the contract now before us obligated appellant to undertake the employment and to perform extensive duties enumerated in Section One of the contract. In exchange for appellant's promise to perform the GRDA promised to compensate appellant at a fixed rate and, as we have above held, for a fixed period. Our conclusion is that this contract was based on a *quid pro quo*. There is consideration and thus no lack of mutuality under the Oklahoma doctrine. This conclusion is compelled by the express terms wherein appellant promises to render the specified contractual performance. The promise is not illusory or such as to make appellant's performance optional or entirely discretionary. *See, e. g., Wharf Restaurant, Inc. v. Port of Seattle*, 24 Wash.App. 601, 605 P.2d 334. The contract also sets forth the unequivocal promise of appellee to perform. In a contract for personal services such mutual promises provide sufficient consideration. The contract was not invalid for lack of "mutuality." Oklahoma, in actions seeking specific performance, requires mutuality of obligation and remedy. *Thompson v. Giddings*, 276 P.2d 229 (Okl.); *Sohio Petroleum Co. v. Brannan*, 205 Okl. 1, 235 P.2d 279. *See also Phillips Petroleum Company v. Buster*, 241 F.2d 178 (10th Cir.). We are not concerned with specific performance, and this line of cases is not helpful.

The trial court also held that the 1966 contract violated public policy in that it purportedly deprived succeeding boards of directors of their powers of management.

It is apparent that contracts for personal management services entered into by public or quasi-public agencies were, and perhaps are, subject to limitations not placed on such contracts of private entities. Also, the authorities make a distinction based on the differences between governmental and proprietary functions of the agency. *See Bridgeport Irr. Dist. v. United States*, 40 F.2d 827 (8th Cir.). We are dealing with a board of an agency exercising proprietary functions—the development and sale of water.

The Authority was formed to control, store, and preserve the waters of the Grand River for any useful purpose and to distribute and sell the water. Okla.Stat. tit. 82,

§ 862(a). To this end the GRDA is expressly granted a broad variety of powers, privileges, rights, and authority. *See generally id.* § 862. Section 862(n) provides GRDA the authority "[t]o make contracts and to execute instruments necessary or convenient to the exercise of the powers, rights, privileges, and functions conferred upon it by this Act." It is also authorized "[t]o do any and all other acts or things necessary or convenient to the exercise of the powers, rights, privileges, or functions conferred upon it by this Act or any other act or law." *Id.* § 862(q). Obviously the Oklahoma legislature intended to grant broad powers.

While it had the power to appoint an officer, agent, or employee to render the necessary financial advice (§ 862(m)), it chose instead to contract with an outside consultant for such services. That this is a reasonable business practice of governmental bodies is revealed in the Oklahoma statutes governing public finance. The legislature in 1973 after this issue arose explicitly recognized such contracts in the following terms:

> "In all proceedings leading to the issuance and sale of general obligation bonds or revenue bonds by any state agency acting pursuant to a specific legislative validating act, any financial or marketing consultant employed by the state for services relative to the marketing of such bonds shall not be paid a fee in excess of that authorized in the validating act."

Okla.Stat. tit. 62, § 15(c). While this statute was enacted in 1973 and thus does not control the case before us, it does shed significant light on the public policy arguments. The Authority has construed the Act to provide it the authority to enter into such contracts pursuant to section 862(n). The statutes make no distinction between contracts for services and other contracts. The contract here concerned is for technical advice, and is not a contract for management or with a person to occupy a position of authority.

Oklahoma Statutes title 82, section 862(b), expressly gives the board authority to enter into contracts with the only expressed limitation that they may not exceed fifty years' duration. This provision expressly on the duration aspect answers much of the argument that the limit is related to the terms of the directors. Again there is no distinction as to personal service and other contracts. *See also* the discussion of the similar law in Kansas in *Kirchner v. Kansas Turnpike Authority,* 336 F.2d 222 (10th Cir.), concerning personal services of a general manager.

The power of the board of directors to contract inevitably involves the power to bind the Authority to a course of conduct or policy for a stated period of time and often for an extended period. In *Grand River Dam Authority v. National Gypsum Co.,* 352 F.2d 130 (10th Cir.), we upheld its authority to enter into a contract to sell electric energy, water, steam, and compressed air to a private customer at a fixed rate for twenty-five years. As time progressed the costs of providing these services rose and the board of directors had changed. GRDA attempted to raise the rates charged to National Gypsum before the 25-year contract had expired, and we held that it breached the contract thereby. We reasoned that at the time it entered into the contract its board of directors carefully considered which rates would be appropriate to meet its requirements. It arrived at a decision and acted accordingly. Thus even if experience were to show that this judgment was unwise it was still valid and binding. The legislature provided the authority for GRDA to set its own rates. Okla.Stat. tit. 82, § 868. GRDA did so in its contract with National Gypsum, and it should be noted that it so acted pursuant to its section 862(n) contract authority. After the contract was formed the legislature twice amended the Act without amending section 862(n) to restrict the authority to so contract.

■ We must hold that the authority of GRDA to contract includes contracts for personal services and such contracts are subject to the same limitations as the contract in *National Gypsum* and no other limi-

tations. The 1966 contract was not contrary to public policy and was a valid agreement. Thus the Authority violated the 1966 contract by terminating it before the end of its term. Appellant is entitled to recover reasonable damages upon proper proof.

With regard to the 1970 contract the trial court found as a matter of fact and law that this agreement was contingent upon the occurrence of two events. In its Findings of Fact and Conclusions of Law the court stated:

> "[T]he Court concludes that it [the 1970 contract] has but a single purpose, to wit: the employment of the plaintiff as a financial adviser to GRDA *in the event* the GRDA passes a resolution authorizing the purchase of properties or facilities from the Federal Government and/or the extension of the Salina Pumped Storage Project. The language of the contract is clear and explicit and does not involve an absurdity."

II Rec. at 178 (emphasis added). The court also found as fact that GRDA "did not acquire the [federal] properties . . . and plans for completion of the Salina Pumped Storage facility have been abandoned and no bonds have been authorized or issued in connection with either project." II Rec. at 176. These findings are not clearly erroneous and must be sustained. We have stated before, "[t]he coming into being of the rights of a party under a contract can be made to depend on the happening of a future event or condition." *Skelly Oil Co. v. Wickham*, 202 F.2d 442, 446 (10th Cir.). That is what occurred here. Appellant's contentions to the contrary notwithstanding the contract is not ambiguous on this point. The court therefore properly excluded the parol evidence offered by appellant.

The judgment of the lower court is affirmed in part, reversed in part, and the case remanded for the court's determination of the amount of damages to which appellant is entitled under the 1966 contract.

LOGAN, Circuit Judge, concurring in part and dissenting in part.

I agree with the result reached by the majority on the 1970 contract. If I could read the 1966 contract as definitely contemplating completion of the sale of $110,000,000 of authorized bonds within a limited time frame, I would agree with the majority's conclusion on that contract also. But I think, in context, the 1966 contract was a long-term personal services contract, intended to bind the Authority to hire Mikesell Associates as financial consultants when and if they were needed. As such it is not unlike a commitment to hire a particular lawyer for his or her lifetime whenever the corporation has need for legal services. I believe that such a contract is unenforceable to the extent it has not been performed.

The applicable statute states the $110,000,000 bond authorization in terms of an overall limit. "The district shall have power and is hereby authorized to issue from time to time, as the need thereof arises, bonds for corporate purposes of not to exceed One Hundred Ten Million Dollars ($110,000,000.00), in such amount or amounts as are necessary or convenient to the exercise of the powers, rights, privileges and functions conferred upon it by this Act . . . ." Okla.Stat.Ann. tit. 82, § 870 (West 1970). The 1966 contract, replacing a 1955 contract, tracks the language of the statute, reciting that the Authority is authorized to issue "from time to time as the need therefor arises bonds for corporate purposes of not to exceed $110,000,000," and that the Authority proposes to issue "from time to time" bonds for unspecified improvements. It then purports to bind the Authority to employ the Mikesell partnership as financial consultant until all remaining authorized bonds ($38,000,000) are issued. The most that I can infer from this is a contract for the lifetime of the Mikesell partners or until the authorized bond limits are reached. There is no indication when, if ever, the Authority would issue the remaining authorized bonds.

The Grand River Dam Authority statute was passed in 1935. By the date of signing

the 1966 contract only $72,000,000 of bonds had been issued, and the Authority had been operating eleven years under a 1955 agreement with a predecessor to R. S. Mikesell Associates. At the end of more than ten additional years, when the 1966 contract was terminated, $8,800,000 of the authorized bonds remained unissued. The 1970 contract is pertinent in that it was made in contemplation of legislation authorizing an expansion of the purposes for which bonds could be issued by the Authority.

It seems clear from the record the then existing board of directors of the Authority intended to bind the Authority *ad infinitum* to this particular financial advisor because of its confidence in the partnership's expertise and its desire to avoid political pressures designed to obtain this bond business.

The crucial question is whether this contract would be regarded by the Oklahoma courts as violative of public policy. I think the trial court determined correctly that it would, although I do not agree with its conclusion that such a contract may not extend beyond the term of the contracting board.

Oklahoma appears to have no case directly in point, but there are many cases in other jurisdictions involving private corporations. A few decisions indicate a contract for personal services may not run beyond the term of the board of directors that enters into it. *E.g., Beaton v. Continental Southland Sav. & Loan Ass'n*, 101 S.W.2d 905 (Tex.Civ.App.1937). But most permit contracting for a reasonable term. In several cases contracts for five years or less have been upheld. *E.g., United Producers & Consumers Co-op. v. Held*, 225 F.2d 615 (9th Cir.1955) (3 years); *In re Paramount Publix Corp.*, 90 F.2d 441 (2d Cir.1937) (3 years); *Realty Acceptance Corp. v. Montgomery*, 51 F.2d 636 (3d Cir.1930) (5 years); *Streett v. Laclede-Christy Co.*, 409 S.W.2d 691 (Mo.1966) (5 years); *Leventhal v. Atlantic Fin. Corp.*, 316 Mass. 194, 55 N.E.2d 20 (1944) (5 years). In at least two cases ten years has been regarded as reasonable. *In re American Range & Foundry Co.*, 22 F.2d 558 (D.Minn.1927); *Koppitz-Melchers,*

*Inc. v. Koppitz*, 315 Mich. 582, 24 N.W.2d 220 (1946) (dictum). One case held that a suit for breach of a twenty-year employment contract stated a cause of action because the duration was not per se against the interests of the corporation and its stockholders. *Whitley v. Whitley Const. Co.*, 121 Ga.App. 696, 175 S.E.2d 128 (1970). Another case upheld a lifetime contract employing the former chairman of the board as a consultant and prohibiting him from competing with the company. Because the former chairman was seventy years old when the contract was executed, the court concluded the lifetime term was limited and reasonable under the circumstances. *Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 218 A.2d 526 (1966).

However, most courts considering contracts for an indefinite period of time, lifetime or long duration (except for contracts settling a claim with an injured employee) have struck them down as unreasonably binding the hands of future directors. *E.g., Wilson v. Jennings*, 344 Mass. 608, 184 N.E.2d 642 (1962) (16 years); *Borland v. John F. Sass Printing Co.*, 95 Colo. 53, 32 P.2d 827 (1934) (indefinite term, as long as employee owned stock); *Clifford v. Fireman's Mut. Benev. Ass'n*, 232 App.Div. 260, 249 N.Y.S. 713, aff'd mem., 259 N.Y. 547, 182 N.E. 175 (1932) (lifetime); *Beers v. New York Life Ins. Co.*, 66 Hun. 75, 20 N.Y.S. 788 (Sup.Ct.1892) (lifetime). *Cf. Arentz v. Morse Dry Dock & Repair Co.*, 249 N.Y. 439, 164 N.E. 342 (1928) (construing contract for "permanent" employment as one to continue until one party wished to sever the agreement).

The vast weight of authority would seem to be against enforcement of very long or indefinite term contracts. Indeed, this Court has stated in the context of applying Oklahoma law that a lifetime contract is invalid absent special circumstances such as personal injury. *General Paint Corp. v. Kramer*, 57 F.2d 698, 703 (10th Cir.), *cert. denied*, 287 U.S. 605, 53 S.Ct. 10, 77 L.Ed. 526 (1932). The majority minimizes the public policy argument, however, by referring to Okla.Stat.Ann. tit. 82, § 862(b)

(West 1970), which provides that the Authority has the power to enter contracts for terms up to fifty years in connection with the development and generation of water power, electric power and electric energy, and the selling, reselling, interchanging and distribution of electric power and energy. The majority's conclusion rests upon its unexplained determination that section 862(b) also applies to personal service contracts. My reading of the statutory provisions enumerating the Authority's powers leads me to believe that section plainly does not apply to personal service contracts. Section 862, at the time the 1966 contract was executed, enumerated seventeen powers in separate subsections. The Authority's power to contract with Mikesell Associates would derive from subsection (m), authorizing appointment of officers, agents, and employees, and subsection (n), authorizing necessary and convenient contracts. Neither section purports to give the board the power to enter binding, permanent (or fifty-year) personal services contracts.

In view of the strong, generally recognized policy against lengthy or indefinite terms in such contracts, and the absence of specific statutory guidance here in contrast to the specific durational authorization concerning development and distribution contracts, I cannot conclude the Oklahoma legislature intended to allow the board to bind its successors to permanently employ certain individuals or entities. This conclusion seems particularly cogent because the members of the board are political appointees. *See* Okla.Stat.Ann. tit. 82, § 863 (West 1970). The public policy limiting the ability of a board to bind its successors indefinitely, in the absence of a specific statutory directive, is even stronger when public bodies rather than private corporations are concerned.

Whether the 1966 contract at issue here is considered to be limited to a fifty-year term, to the lifetime of Robert S. Mikesell and George S. Wade, or for the indefinite period in which the Authority will have the need to issue $38,000,000 in bonds (which did not in fact occur in 10 years), I believe the Oklahoma courts would strike it down as violative of public policy. Accordingly, I would affirm the trial court on its treatment of that contract.